UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

CHONG L. LEE,

                    Plaintiff,

        v.                                          Case No. 18-cv-580-pp

TAMMY DEVRIES,

                    Defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DKT. NO. 21) AND DISMISSING CASE

The plaintiff, who is representing himself, filed this lawsuit under 42 U.S.C. §1983. On May 16, 2018, U.S. Magistrate Judge William Duffin (the judge assigned to the case at the time) allowed the plaintiff to proceed on a First Amendment claim against the defendant based on the plaintiff's allegations that the defendant retaliated against him because he refused to quit his prison job, he helped other inmates with their legal work and he spoke out against the defendant. Dkt. No. 9. About a week later, the case was reassigned to this court after the parties refused to consent to a magistrate judge hearing and deciding the case. On February 18, 2019, the defendant filed a motion for summary judgment, which now is fully briefed. Dkt. Nos. 21, 34, 35. The court grants the defendant's motion and dismiss the case.

1

# I.  RELEVANT FACTS

## A.  Procedural History

The defendant filed her motion for summary judgment on February 18, 2019. Dkt. No. 21. Under the court's July 12, 2018 scheduling order (Dkt. No. 15), the plaintiff's response brief and supporting materials were due within thirty days of service of that motion—in this case, by March 20, 2019, which came and went without the plaintiff filing anything. On April 18, 2019, the court issued an order to show cause, requiring the plaintiff to either respond to the motion or explain why he couldn't by May 24, 2019. Dkt. No. 27. In that order, the court advised the plaintiff that, if he chose to respond to the defendant's summary judgment motion, he must respond to each of the defendant's proposed facts. Id. at 2. The court informed the plaintiff that, if he did not indicate whether he agreed or disagreed with a proposed fact, the court would assume that he agreed with the proposed fact. Id. The court also informed the plaintiff that he must support with evidece his assertions in response to the defendant's motion. Id. The court told the plaintiff that he could rely on documents to support his assertions or he could tell the court what happened in an affidavit or unsworn declaration. Id.

Three days before the response deadline, the plaintiff filed a motion for a stay or an extension of time. Dkt. No. 29. He asked for forty-five days "to seek affidavits from witnesses and to allow time for the defendant to adequately turn requested discovery over to the plaintiff . . . ." Id. at 1. He asserted that the

2

defendant had not provided him with discovery he requested, and as for the affidavits, he'd only recently learned of the locations of the inmates whose depositions he sought. Id. The plaintiff asked the court to "make an order for the defendant to produce discovery on the issue with Brian Greff, and the transfer of the plaintiff from DCI [Dodge Correctional Institution] to GBCI [Green Bay Correctional Institution] within 30 days of the order." Id. at 3.

On August 20, 2019, the court denied the motion to compel and the motion to stay. Dkt. No. 33. The court explained that the motion to compel did not comply with this court's Local Rule 37, id. at 2, that the plaintiff could have filed the motion before discovery closed, id., and that he hadn't given any reason for his delay, id. at 2-3. The court concluded that the plaintiff had not given the court any reason to delay the case in order for him to obtain affidavits from other inmates, given that he didn't explain when he'd learned of their location or why he needed their affidavits to support his claims. Id. at 3-4. Finally, the court found that the plaintiff was not entitled to discovery regarding why the DOC moved him from Dodge to Green Bay. Id. at 4. The court gave the plaintiff a deadline of September 11, 2019 by which to respond to the defendant's motion for summary judgment. Id. at 4. At the end of the order, the court told the plaintiff that he had to file his response "in time for the court to receive it by the end of the day on **Wednesday, September 11, 2019**." Id. at 5.

3

The plaintiff's response brief was electronically filed at 8:59 a.m. on September 12, 2019. Dkt. No. 34. The plaintiff did not respond to the defendant's proposed findings of fact, did not file any documents in support of his response brief and he did not file an affidavit or an unsworn declaration telling the court his version of what happened. On this basis, the court could consider the defendant's proposed facts (Dkt. No. 23) undisputed for purposes of deciding summary judgment. See Civil Local Rule 56(b)(4).

Giving the plaintiff the benefit of the doubt, however (a benefit it is not certain he deserves), the court also will consider the allegations in the plaintiff's sworn complaint, which the Seventh Circuit has held is an affidavit when the plaintiff signs it under penalty of perjury. Ford v. Wilson, 90 F.3d 245, 247 (7th Cir. 1996). In Ford, the Seventh Circuit emphasized that it did not commend the practice of a plaintiff submitting only his sworn complaint as the evidence in opposition to summary judgment, noting that "[t]he federal rules envisage the submission of evidentiary material in response to a motion for summary judgment as a means of sharpening the issues, so that the judge can determine just what  if anything must be tried." Id. (citing Celotex Corp. v. Catrett, 477 U.S. 3177, 323-24 (1986); Algie v. RCA Global Comm., Inc., 891 F. Supp. 875, 883 (S.D.N.Y. 1994)). The court observed that "just to point to the factual assertions in [a plaintiff's] verified complaint is bound to make the identification of genuine issues of material fact difficult, complicating the work of the judge." Id. But the court concluded that a court should not grant

4

summary judgment based solely on the fact that a plaintiff had not filed a separate affidavit or evidence, when he'd filed a verified complaint. Id.

      B.   <u>Factual Background</u>

          1.   *Defendant's Proposed Facts*

During the events giving rise to the plaintiff's claim, the plaintiff was an inmate at Dodge. Dkt. No. 23 at ¶1. Defendant Tammy DeVries was a librarian at Dodge. Id. at ¶2. On March 26, 2017, the plaintiff began working in the Dodge law library as a library clerk. Id. at ¶3. About four months later, the plaintiff changed jobs and became the law clerk at the library. Id.

His job duties as the law clerk included maintaining the law library collection, performing tasks related to circulation and in-library use of legal materials and assisting inmates with legal research. Id. at ¶5. While law clerks help inmates with legal research and answer questions about legal issues, they are not allowed to give legal advice. Id. at ¶6. According to the defendant, prison rules prohibit law clerks from giving legal advice to inmates *while they are working* because law clerks are not lawyers and are not trained to give legal advice. Id. at ¶¶7-8, 11. Law clerks *may*, however, help other inmates with their cases when they are *not* working. Id. at ¶9.

The defendant explains that while working, the plaintiff was required to stay by his desk and be available to answer inmates' questions. Id. at ¶12. He also was to help inmates with printing forms, statutes and case law, and with using LexisNexis. Id. at ¶13. He was not allowed to help inmates with filling out

5

forms, answering legal questions or providing interpretations of case law, statutes or procedures. Id.

On June 12, 2017, the defendant gave the plaintiff his first work performance evaluation. Id. at ¶14. She noted that the plaintiff showed a lot of motivation toward his job, worked well with others and worked with little supervision. Id. at ¶15. The defendant explains, however, that after the first evaluation, she began to notice problems with the plaintiff's work. Id. at ¶17. The defendant noted that the plaintiff was moving around talking loudly with other inmates, laughing, and that he was assisting them with their cases, which he was not allowed to do while working. Id. at ¶18. The defendant believed that the plaintiff's assistance had crossed the line to giving legal advice, which prison rules prohibited while he was working. Id. at ¶¶18-19. For example, the plaintiff was telling inmates how to fill out forms and what tax forms to fill out. Id. at ¶20.

On November 30, 2017, the plaintiff told another librarian that he did not want to be the law clerk anymore and that he wanted to go back to working as a law library worker. Id. at ¶22. The plaintiff was tired of dealing with the inmates; he said they were giving him headaches. Id. The defendant says that the plaintiff "was given" a voluntary quit form, "based on his statements that he did not want to be the clerk anymore." Id. at ¶23; Dkt No. 24 at ¶18. The plaintiff refused to sign the form. Dkt. No. 23 at ¶24. He also argued with the defendant about what his duties were, and insisted that the assistance he was

6

giving inmates didn't constitute giving legal advice. Id. at ¶25. The plaintiff indicated that he did not want to quit his job; he wanted to switch jobs at the library. Id. at ¶31; Dkt. No. 24 at ¶18. The defendant explains that the plaintiff could not switch jobs because all the positions at the library were full. Dkt. No. 23 at ¶31.

The defendant doesn't dispute that the plaintiff had a right to disagree with her about his performance or whether he was providing legal advice, but she notes that the proper way for him to have handled that disagreement would have been to file an inmate grievance. Id. at ¶26. The plaintiff did not file any grievances about this issue. Id. at ¶27.

Although prison policy required the librarian to conduct performance evaluations every six months, id. at ¶32, the defendant felt that the plaintiff's unsatisfactory performance at his job required to give the plaintiff a second job performance evaluation on November 30, 2017 (about two weeks earlier than required). Id. at ¶¶23, 33. The evaluation noted that the plaintiff was "always" reliable and ready for work on time. Id. at ¶36. She noted that he "usually" accepted supervision when it was necessary, acted responsibly at work, was willing "to learn and apply new skills," worked with little supervision, was interested in his work and "offered relevant suggestions in order to improve job quality." Id. But the evaluation also noted that the plaintiff "infrequently" worked in a cooperative manner with staff and offenders, followed staff's verbal and written directions, had satisfactory work assignments, completed

assignments timely and used his down time constructively. Id. at ¶37. She also noted that she had told the plaintiff "multiple times prior to November 30, 2017, not to process disbursements during the hours of law library, as he needed to stay by his desk to be available to answer questions from inmates." Id. at ¶38. The defendant said that despite these instructions, the plaintiff would leave the library and return to the unit when he had disbursements needing processing, leaving no one to assist the inmates. Id. at ¶38-39. He did this despite the fact that there were set times for him to process disbursements—between 10:30 a.m. and 12:30 p.m. or after 2:30 p.m. Id. at ¶40. The defendant gave the plaintiff an overall evaluation of "unsatisfactory." Id. at ¶41.

The defendant discussed the evaluation with the plaintiff. Dkt. No. 24 at ¶30. Following the evaluation, however, the plaintiff's performance didn't improve; he continued to argue with the defendant about his job duties, to occasionally leave his desk during library hour to go to the unit and process disbursements and to repeat that he wanted a different job in the library and did not want to be a clerk. Dkt. No. 23 at ¶¶28, 43-45.

On March 12, 2018, the defendant observed the plaintiff giving other inmates what she considered legal advice, despite the defendant having told the plaintiff not to do so. Id. at ¶46. Throughout the morning, the plaintiff argued with the defendant about the scope of his job duties and about whether he was giving legal advice. Id. at ¶47.

8

Based on all the issues the defendant was having with the plaintiff, she decided to give him a third job performance evaluation on March 12, 2018. Id. at ¶46; Dkt. No. 24 at ¶38. In the evaluation, the defendant noted that the plaintiff continued to have the same issues she'd outlined in her November 2017 evaluation. Dkt. No. 23 at ¶49. She also indicated that the plaintiff's performance had worsened in other areas, including "infrequently" displaying responsible behavior at work and performing his work with minimal supervision. Id. at ¶51. In no areas in the March 2018 performance review did the defendant indicate the plaintiff was "always" performing his duties. Id. at ¶53. The plaintiff's overall evaluation was "unsatisfactory" and had gotten worse since his last evaluation. Dkt. No. 24 at ¶42. Accordingly, the defendant terminated the plaintiff's employment. Id.

## 2. *Plaintiff's Verified Complaint*

The plaintiff claims that on November 30, 2017, he told some other inmates in the library that he wanted to switch jobs with them, because his job was becoming a headache. Dkt. No. 1 at 2. He claims that one of the staff heard this and reported it to the defendant; the staff then gave the plaintiff a waiver form for quitting. Id. The plaintiff says he responded that he didn't want to quit—he just wanted to switch jobs with someone else in the library. Id. at 4. The plaintiff says that he "asserted his first amendment rights." Id. The plaintiff says that the defendant then gave him a "false poor work performance

evaluation" in retaliation for his failure to sign the quit form. Id. He admits that he and the defendant "continued to have words." Id.

The plaintiff claims that the defendant had thrown away the jury instructions, that he told the defendant that other inmates needed those instructions, and that he told the other inmates that there were no longer any jury instructions for them to use. Id. He says the defendant told him that she'd contacted someone and had been told that the institution library didn't have to keep jury instructions. Id. The plaintiff alleges that the defendant told him that he shouldn't go around telling inmates about the jury instructions; the plaintiff says he then "argued" that "Defendant can not just implement various library policies that restrict inmates from learning or obtaining correct legal information." Id. at 4-5. He asserts that he "was warned" that if he got two poor work evaluations, he would be terminated. Id. at 5.

The plaintiff alleges that on March 12, 2018, he went to work. Id. He says that under the library scheduling policy, only eleven inmates are "allowed." Id. He asserts that "around the 8:30 a.m. and 9:30 a.m. period Defendant [] called the 1:30 p.m. period in to join the first two periods." Id. He says this resulted in "an overflow where other inmates had to sit in the regular library." Id. The plaintiff says that he was busy helping various inmates, and others were waiting, so some of his co-workers came to help him out. Id. He claims that the defendant saw him helping a particular inmate, and thought that he was "too social." Id. at 5-6. The plaintiff says that the defendant instructed another staff

10

member to sit in the law library and told the plaintiff's co-workers that they should leave because the plaintiff could handle his job. Id. at 6. The plaintiff then goes into detail about help he was providing an inmate who was asking questions about taxes. Id. He says another staff member asked him to answer other inmate questions. Id. at 6-7. He asserts that he answered the various inmates' questions, but that when he headed back to the law library, the defendant stopped him and told him he wasn't supposed to help inmates. Id. at 7. The plaintiff replied that that he was not acting out of the scope of his employment. Id. The defendant then called him in and told him that while he worked hard and did a good job, he was going outside of his job duties by helping inmates. Id. The plaintiff argued back that he was just telling inmates where to find information, because some were computer illiterate or "illiterate period." Id. According to the plaintiff, there ensued an extended argument in which the plaintiff asserted his First Amendment rights and the defendant sent him back to his unit. Id. at 8. She later gave him another poor work evaluation. Id. The plaintiff asked for damages for the defendant violating his First Amendment rights. Id. at 9.

## II.    DISCUSSION

### A.    Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also

11

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

B.    First Amendment Retaliation Standard

 "To prevail on a First Amendment retaliation claim, [a plaintiff] must ultimately show that (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at

12

least a motivating factor' in the Defendants' decision to take the retaliatory action." Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009). A few months ago, the Supreme Court reiterated that, "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." Nieves v. Bartlett, 139 S. Ct. 1715, 1722 (May 28, 2019) (internal quotation marks and citations omitted). This means that, "[i]f an official takes adverse action against someone based on that forbidden motive, and non-retaliatory grounds are in fact insufficient to provoke the adverse consequences, the injured person may generally seek relief by bringing a First Amendment claim." Id. (internal quotation marks and citations omitted).

The Supreme Court refined the causation element of a First Amendment claim, stating that

> [t]o prevail on such a claim, a plaintiff must establish a causal connection between the government defendant's retaliatory animus and the plaintiff's subsequent injury. It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must *cause* the injury. Specifically, it must be a but-for cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive.

Id. (internal quotation marks omitted) (citing Hartman v. Moore, 547 U.S. 250, 260 (2006) (recognizing that although it "may be dishonorable to act with an unconstitutional motive," an official's 'actions colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway'")).

13

The Seventh Circuit since has explained that

> [t]o prove causation on a First Amendment retaliation claim, a plaintiff may rely on both direct and circumstantial evidence. Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption. Circumstantial evidence may include suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group.

Lavite v. Dunstan, 932 F.3d 1020, 1031 (7th Cir. 2019) (internal quotation marks and citations omitted).

C.    The Court's Analysis

The plaintiff alleged in his complaint that the defendant gave him two poor evaluations, which resulted in him losing his job, because he refused to voluntarily quit, he was assisting other inmates and he argued with the defendant about the scope of his job duties.[1] The defendant argues that the plaintiff cannot prevail on his retaliation claim because the plaintiff did not engage in activity protected by the First Amendment and that even if he did, the plaintiff cannot show that the activity was a motivating factor in the defendant's actions.

---

[1] In his response brief, the plaintiff also asserts that the defendant retaliated against him because he spoke to her supervisor and wrote grievances about her. Dkt. No. 34 at 3. The plaintiff did not assert these factual allegations in his complaint, nor does he support them with evidence such as copies of the grievances or an unsworn declaration. The court will not consider these new factual allegations. Whitaker v. Milwaukee Cty., Wis., 772 F.3d 802, 808 (7th Cir. 2014) (reaffirming that plaintiffs cannot introduce new factual bases for a claim in response to a summary judgment motion).

14

The first question the court must ask is whether any of the activities the plaintiff identified are protected by the First Amendment. He alleges that he refused to sign the form saying that he would voluntarily quit his job as a law clerk. It is not clear that refusing to sign a form constitutes First Amendment activity. See Williams v. Swenson, Case No. 14-cv-1594, 2015 WL 5332757, at *7 (E.D. Wis. Sept. 10, 2015). And the court is not clear on whether the defendant gave the plaintiff his negative performance review before or after giving him the form.

The plaintiff also asserts that the defendant retaliated against him for "perform[ing] the assigned duties of his position." The plaintiff has not cited any case holding that an inmate has a First Amendment right to perform job duties. To the extent that the plaintiff may be claiming that the defendant retaliated against him because he talked with, or answered questions for, other inmates, the question of whether that activity is protected by the First Amendment depends on what the plaintiff was telling those other inmates. The Supreme Court has concluded that "restrictions on prisoners' communications to other inmates are constitutional if the restrictions are 'reasonably related to legitimate penological interests.'" Shaw v. Murphy, 532 U.S. 223, 225 (2001), quoting Turner v. Safley, 482 U.S. 78, 89 (1987). The Court held that prisoners do not have a First Amendment right "to provide legal assistance that enhances the protections otherwise available under *Turner*." Id. So the First Amendment does not protect an inmate's right to give another inmate legal advice. The

15

plaintiff argued (both with the defendant and in his verified complaint) that he wasn't giving legal advice—he was just answering questions for other inmates. Arguably, if all the plaintiff was doing was saying, "The book about taxes is on the third shelf," or "here's the form you were asking for," that likely would constitute protected speech. There is a dispute between the parties, however, about exactly what the defendant was saying to his fellow inmates at various times between June 2017 and March 2018.

In his complaint, the plaintiff alleged that the defendant gave him bad performance reviews because he spoke up about her getting rid of the jury instructions and because he argued with her about the limitations of his job duties. The Seventh Circuit has held that while inmates have a First Amendment right to criticize institution policies—specifically library policies— they "must do so 'in a *manner* consistent with [their] status as a prisoner." Watkins v. Kasper, 599 F.3d 791, 797 (7th Cir. 2010) (quoting Freeman v. Tex. Dep't of Criminal Justice, 369 F.3d 854, 864 (5th Cir. 1994)). The court has held that by openly challenging a librarian's directives in front of other law clerks, an inmate impedes the librarian's authority and her ability to implement library policy. Id. The Seventh Circuit has held that rather than openly arguing with or challenging the librarian, an inmate "could have taken the less disruptive approach of filing a written complaint," id., something the plaintiff here did not do. This court concludes, as did the Watkins court, that the plaintiff's arguments with the defendant about her implementation of

library policy and her views regarding whether he was exceeding the scope of his job duties was not protected speech under Turner and Watkins.

Even if the plaintiff had engaged in protected speech in refusing to sign the form, assisting inmates and criticizing or arguing with the defendant, the plaintiff cannot satisfy the causation element of his retaliation claim. The "evidence" to which the plaintiff points in support of his argument that the defendant retaliated against him are the facts that he received the first poor work evaluation shortly after he declined to sign the waiver to quit form and the second poor work evaluation shortly after he argued with the defendant about whether how he was helping other inmates could be characterized as giving legal advice. In other words, he asserts that the timing of the poor evaluations was suspicious.

The Seventh Circuit has held that "suspicious timing will rarely be sufficient in and of itself to create a triable issue. The reason is obvious: suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." Kidwell v. Eisenhauer, 679 F.3d 957, 966 (7th Cir. 2012) (internal quotation marks and citations omitted). Here, even viewing the facts in the light most favorable to the plaintiff (as the court must do at summary judgment), the defendant's timing wasn't even suspicious.

With regard to the first poor evaluation in November 2017, the defendant explains that shortly after the June 2017 evaluation, she began to notice problems with his job performance—he talked and laughed with other inmates,

17

he was loud and the defendant believed he was giving legal advice, which he was not allowed to do during work hours.[2] The defendant explains that her concerns continued for months, until November 2017, when another librarian told her that the plaintiff had stated that he didn't want his job anymore. The defendant explains that the plaintiff's declining work performance coupled with his stated displeasure with his job prompted her to give the plaintiff the opportunity to quit. When the plaintiff declined to quit, she decided to give him formal feedback in the form of a job performance review.

The plaintiff hasn't disputed much of this evidence. He agrees that the law clerk job was a headache, and that he asked other inmates whether he could switch jobs with them. So there's no dispute that the defendant had reason to believe the plaintiff didn't want to perform the law clerk job anymore. The plaintiff did not provide any evidence to demonstrate that his job performance hadn't declined between June and November of 2017. He provided no evidence that prior to November 2017 he was not crossing the line into giving advice to other inmates. His own version of events demonstrates that he was arguing with the defendant as of the November 2017 negative evaluation.

--------

[2] The plaintiff does not contest the policy prohibiting prison law clerks from giving legal advice to other inmates while they are working in the library. Instead, he argues only that the defendant improperly characterized his help to other inmates as legal advice.

18

Regarding the second poor work evaluation in March 2018, the plaintiff asserts that he received this evaluation because he spoke up about the defendant's getting rid of the jury instructions and that he disagreed with her about his duties being limited to helping inmates find books. Again, he has presented no evidence to rebut the defendant's evidence that in the four months since his last evaluation, his performance had declined. The plaintiff never has responded to the defendant's assertions that he would leave his post in the library to process disbursements, despite being told not to do so. He does not dispute that he argued with the defendant and criticized her policies to other inmates. The defendant says that the plaintiff admitted in his deposition that he knew he should have filed an inmate complaint, rather than arguing with and criticizing the defendant; the court does not know if this is true, because the defendant did not attach the plaintiff's deposition to her summary judgment materials. But the plaintiff's own complaint confirms his criticisms and arguments.

No reasonable jury could conclude that the defendant gave the plaintiff the second poor evaluation in retaliation for his exercising his First Amendment rights. The only reasonable inference the court can draw from *all* of the evidence—the defendant's *and* the plaintiff's—is that the defendant gave the plaintiff the poor job evaluations because his performance was erratic (good sometimes, poor more and more frequently) and because he was argumentative

19

and would not follow the defendant's directions. The defendant is entitled to summary judgment.

## III.    CONCLUSION

The court **GRANTS** the defendants' motion for summary judgment. Dkt. No. 21. The court **DISMISSES** this case and will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within **30 days** of the entry of judgment. See Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Federal Rule of Appellate Procedure 4(a)(5)(A).

Under certain circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. See Federal Rule of Civil Procedure 6(b)(2).

20

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 30th day of September, 2019.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**

21